JOURNAL ENTRY AND OPINION
Defendant-appellant Anthony Walker appeals from his convictions following a jury trial for aggravated burglary (R.C. 2911.11); aggravated robbery (R.C. 2911.01); attempted murder (R.C.2923.02); kidnapping of two people (R.C. 2905.01); and aggravated murder in the course of aggravated burglary or robbery (R.C. 2903.01), all with firearm specifications. The jury acquitted him of aggravated murder with prior calculation and design (R.C. 2903.01). Defendant claims that the court erred: in refusing to grant a mistrial for jury misconduct; in giving improper instructions to the jury; in failing to journalize defendant's conviction for two years; and for allowing irrelevant and prejudicial evidence. Ineffective assistance of counsel is also asserted for failure to object to allegedly incomplete jury instructions. We find no reversible error and affirm.
Defendant was charged with complicity along with six co-defendants in the killing of Derrick Harris during a burglary occurring on April 30, 1991. He was originally tried and found guilty by a jury in 1991 leading to imposition of the death penalty. His original conviction was reversed by this Court on appeal due to ineffective assistance of counsel in failing to seek suppression of evidence seized from defendant's premises without warrant or consent. State v. Walker (Oct. 28, 1993), Cuyahoga App. No. 62862, unreported. The evidence at his second trial leading to this appeal will be summarized below.
The State's first witness was Relana English who met defendant in 1991 and was frequently at defendant's house on East 118th and Union Avenue. Regular patrons at these affairs include Marvin, Willie and Eddie Burrage, their step-brothers, David and Craig Thomas, and English. English was Marvin Burrage's girlfriend at the time. Others who came to defendant's house included Annette Dean and the victim's girlfriend, Angela Harvey.
English knew Derrick Harris, the victim, since 1989. About six or seven days prior to the victim's death on April 30, 1991, English, Angela Harvey, Annette Deane and the defendant were at the defendant's house when a discussion regarding the victim occurred. Angela stated that the victim had a lot of money to buy a truck and she knew that he had the money in the house because she had seen it. She also explained where people were living in the victim's house.
On April 30, 1991, at 1:40 a.m., English went to defendant's house. When she arrived, defendant, Marvin Burrage, Craig Thomas, David Thomas, two other men and one woman were all standing outside. English followed the group in her car as they drove to East 81st and Kinsman. The two men, one later identified as Steve Cox (a.k.a. "Coz") and the woman drove separately in a maroon car. When they arrived, Marvin Burrage, Eddie Burrage, Craig Thomas, David Thomas and Coz got out of their cars and went into a house. Defendant stayed in his car. Approximately ten minutes later, English heard a gunshot and the men ran back to their cars. All the cars then proceeded back to defendant's house.
At defendant's house, defendant asked English where the victim, Derrick Harris, lived and she agreed to show him. Prior to leaving, English saw three Tec-9 firearms on defendant's bed. The group then left defendant's house and proceeded to the victim's house at 11216 Lardet Avenue. English drove her car along with Jason Peterson, Willie Burrage and Eddie Burrage. Defendant parked about six houses down from the victim's house and the group walked to the house. English and the defendant remained at the cars. About fifteen minutes later, the group returned from the victims house and they all went back to defendant's house. At defendant's house, the group discussed the victim's beating and what items they took from the victim and his house. The items English observed included a cellular phone, a briefcase, some jewelry, bottles of wine and a black pouch. Defendant divided up the stolen money between the group. English received $40 from defendant for driving the truck. Defendant then collected the guns and brought them to his room.
The next day, English learned of Derrick Harris' death and the death of another man at East 81st and Kinsman.
Frances Harris, the victim's mother, testified that she lived at 11216 Lardet Avenue with her brother, Walter Harris, and her son, Derrick Harris. On April 30, 1991, at approximately 3:00 a.m., two men pulled her out of bed and told her to wake everyone in the house up at gunpoint. After she woke up her brother and her son, they pushed Mrs. Harris to the floor and shot her in the stomach. They proceeded to beat her son as they asked him for money. She later found her son laying face down dead on her mattress. When she returned to her house after the hospital, she noticed several things missing, including bottles of wine and her cellular phone.
Annette Deane testified she was also at defendant's house when defendant and English discussed the victim, Derrick Harris, and his money for a truck. She testified that they discussed robbing the victim. After hearing this discussion, she told the victim "to watch his back, to be careful." She warned the victim to watch out for English and the defendant. Deane testified that during March and April, 1991, she had seen Tec-9 weapons at defendant's house on more than one occasion.
Walter Harris, the brother of Frances Harris and uncle of Derrick Harris, also testified. He lived on the second floor of Frances' house on Lardet Avenue and Derrick lived on the third floor. On April 30, 1991, at approximately 3:00 a.m., he was awakened by Frances knocking on Derrick' door. When Walter went to his door, he observed a man holding a gun to Frances' head. Walter was immediately told to look at the floor and he was taken upstairs to the bathroom of Derrick's apartment. When they arrived in the bathroom, the men pushed him down and put a rug over his head. After the men left, he discovered Frances had received a gunshot wound and Derrick had been shot dead.
Cleveland Detective Sahir Hasan testified that on May 10, 1991, he was conducting a surveillance for the police department. He observed defendant and Steve "Coz" Cox looking in the trunk of Cox's automobile on the corner of East 118th Street and Union. After backup police units arrived, the men were arrested and two semi-automatic Tec-9 guns and a chrome .357 magnum were confiscated from the trunk of the car.
Marvin Burrage testified that in 1991 he pled guilty to aggravated murder in the death of Derrick Evans. Marvin Burrage testified that he met defendant in 1990 and thereafter, he began selling drugs for defendant and spending a lot of time with him.
Marvin Burrage testified that on April 30, 1991, he participated in two "licks" or robberies. Earlier that day, Marvin was at defendant's house when defendant told him to take Dorian Brown, a.k.a. Drum, home to get his gun, a Tec-9. Defendant told them that he planned to rob a "fat guy" who had "money all around the house and dope in the refrigerators." Defendant stated that two guys lived downstairs and they would have to kick in the door and take them out. Defendant passed out his weapons to the group. Drum got defendant's Magnum .380. Jason Peterson got defendant's Tec-9. Craig Burrage got Drum's Tec-9 and an Uzi.
At defendant's direction, the group left his house and drove in various cars to a house on 83rd Street. The group drove to the house in English's truck, defendant's rental car and Dorian Brown's car. After they arrived, English and defendant stayed in the cars. Jason Peterson kicked in the door and Drum shot the man in the house. They proceeded to beat him. The group looked around for dope and money, but did not find any. Craig then shot the man in the head and they ransacked the house. The group went back to the cars and returned to defendant's house. Marvin told defendant that they had killed the occupant and "there wasn't no money in the house." Defendant then told English to call Derrick Harris and see if he was home. She called twice and when he answered, she hung up. Defendant then stated, "He's soft, they ain't got no weapons. We going to do it anyway."
The group, along with defendant, took the guns again and left defendant's house. Marvin Burrage drove with defendant as English led the way to the victim's house. Defendant and English again stayed at the cars. Jason Peterson kicked in the back door and the group entered the house with their guns drawn. Marvin testified that they dragged Frances Harris upstairs and began stomping and beating Derrick Harris. They also took Walter Harris upstairs, put him in the bathroom and put a rug over him. While the group was searching for the money, Marvin's step-brother, David, shot Frances Harris. Jason then kicked Derrick Harris down the stairs and Marvin brought him into his mother's bedroom where Marvin's stepbrother, Craig, shot him.
The group again went back to defendant's house. Marvin gave defendant the stolen money, and he divided it up. They divided up other items and left the guns at defendant's house.
Subsequently, two weeks prior to defendant's trial, defendant asked Marvin Burrage not to testify. Marvin had previously lied under oath in another case because one of defendant's friends had raped Marvin's wife.
Det. William Cunningham of the Cleveland Police Homicide Unit testified that in early June 1991, Ronetta Johnson, Craig Thomas' girlfriend and defendant's former girlfriend, came to him with the first lead in the Derrick Harris homicide. As a result, Det. Cunningham interviewed Marvin Burrage.
Det. Cunningham testified that around June 10, 1991, the police were doing surveillance on a building at East 79th Street and Kinsman. They had the pager number of the victim, Derrick Harris, whose pager had been stolen. Det. Cunningham paged the number. When David Thomas came out of the house with the pager to answer the page at a nearby public phone, the police arrested him. Willie Burrage was also arrested at this time.
According to Cunningham, Jason Peterson was arrested next on June 13, 1991, at the YMCA on 119th and Miles. The defendant had informed the police of Peterson's whereabouts. On June 17, 1991, defendant was arrested at the Justice Center while wearing Derrick Harris' ring and watch. English was arrested on June 23, 1991. Craig Thomas was arrested sometime in July, 1991. Around May 10, 1991, two Tec-9 weapons were confiscated from defendant's house in regards to the police investigation. After the State rested its case, the defense did not call any witnesses to testify.
At the conclusion of all the evidence, the jury was instructed and it began its deliberations. The jury found defendant guilty on all counts plus the firearm specifications, except for the aggravated murder count with prior calculation and design. On February 13, 1996, a sentencing hearing was held where the court imposed the agreed sentence of thirty-three years to life. This sentence was not journalized until May 26, 1998, nunc pro tunc
for March 13, 1996. This timely appeal followed.
 I. BY REFUSING TO DECLARE A MISTRIAL AFTER THE STATE SUPPORTED DEFENSE COUNSEL'S MOTION FOR MISTRIAL, THE TRIAL COURT VIOLATED ANTHONY WALKER'S RIGHT TO BE TRIED BY A FAIR AND IMPARTIAL JURY AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.
In his first assignment of error, defendant asserts that prior to the start of trial, a woman approached two prospective jurors and offered them information about the case. Defendant asserts that this improper communication constituted juror misconduct, and therefore, the trial court should have declared a mistrial. This assertion is without merit.
Based on the record, we find that a mistrial was improper in this case because the challenged communications took place between dismissed jurors only and not jurors retained for the trial. The record reflects that both of the involved jurors were subsequently excused from the jury.
In State v. Phillips (1995), 74 Ohio St.3d 72, 88, 89, the Supreme Court stated:
 When a trial court learns of an improper outside communication with a juror, it must hold a hearing to determine whether the communication biased the juror. State v. Phillips (1982), 455 U.S. 209, 215-216, 102 S.Ct. 940, 945, 71 L.Ed.2d 78, 84; Remmer v. United States (1954), 347 U.S. 227, 229-230, 74 S.Ct. 450, 451, 98 L.Ed.2d 654, 656. "In a criminal case, any private communication * * * with a juror during a trial about a matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial * * *. [T]he burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." Id. The Sixth Circuit, however, has held that the defense must prove that the juror has been biased. United States v. Zelinka (C.A.6, 1988), 862 F.2d 92, 95 citing Smith v. Phillips, supra; contra United States v. Littlefield (C.A.9, 1985), 752 F.2d 1429, 1431. In cases involving outside influences on jurors, trial courts are granted broad discretion in dealing with the contact and determining whether to declare a mistrial or to replace an affected juror. See United States v. Daniels (C.A.6, 1976), 528 F.2d 705, 709-710; United States v. Williams (C.A.D.C. 1987), 822 F.2d 1174, 1189; Annotation (1992), 3 A.L.R.5th 963, 971, Section 2.
"The United States Constitution does not require a new trial `every time a juror has been placed in a potentially compromising situation * * * [because] it is virtually impossible to shield jurors from every conduct or influence that might theoretically affect their vote.'" State v. Johnson (Jan. 16, 1997), Cuyahoga App. No. 70234, unreported, quoting State v. Phillips,455 U.S. at 217. "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." State v.Franklin (1991), 62 Ohio St.3d 118, 127. "A mistrial should not be granted merely because some minor error or irregularity had arisen." Johnson, supra, citing State v. Blankenship (1995).102 Ohio App.3d 534.
In the instant case, there is no evidence in the record that any of the retained jurors were tainted or in any way biased by this communication. Immediately after the trial court was notified of the conversation, it interviewed all of the jurors involved, Lucille Micatrotto, Marie Strah and Carolyn Bridwell. Micatrotto told the trial court that Ms. Bridwell approached her and Strah in the smoking room and had offered information about the case. Micatrotto told the court that Ms. Bridwell expressed to them that she thought that this was a retrial and that she felt that there was a mistake or something made and they were retrying the defendant. Marie Strah told the court that when they were in the smoking room, she remarked "If this happened so long ago, my God, it's awful slow." Ms. Bridwell responded that "this case was already done once" and that she saw it in the paper. Both Micatrotto and Strah also told the trial court that immediately after these exchanges, both of them ended the conversation and did not mention or discuss this with anybody else.
Following these interviews, defense counsel argued to the trial court that the knowledge of the prior trial tainted the jury. The court responded that an ordinary person would speculate that there might have been a prior trial based on the five-year delay between the crime and the trial. The court further expressed the view that this speculation was going to be in the case no matter how they handled the conversation in the smoking room.
Subsequently, Ms. Bridwell was interviewed by the trial court. She recalled that when she was in the smoking room she expressed to one other lady that her husband had read in the newspaper that something was misfiled in the paperwork and that is why the defendant had to be retried.
Based on these facts, there is no evidence in the record that any of the retained jurors were tainted by this communication between Ms. Bridwell, Micatrotto and Strah. First, this conversation took place in the fourth floor smoking room, not in the jury room. Also, the three women interviewed all expressed to the court that they did not discuss or mention this conversation with any other person or juror. Lastly, all of the women involved were excused and did not serve on the jury.
Defendant has failed to demonstrate that the trial judge in this case abused his discretion by proceeding with the trial after determining that the communications took place between jurors who were excused and not retained for the trial. The trial court is granted broad discretion in dealing with outside influences on jurors and determining whether to declare a mistrial or to replace an affected juror. Even though prejudice must be presumed from any private communication with a juror, the trial court determined from the interviews that the impaneled jury was not tainted. No evidence was presented that any of the impaneled jurors participated in any improper communications. Therefore, we will not substitute our impression for the trial court's judgment about the jury's credibility and impartiality.
Defendant also asserts that the jury was tainted when an impaneled juror thought something was wrong when she saw Micatrotto and Strah in the Justice Center after they had been excused. Again, there is no evidence in the record that any of the retained jurors were tainted by this encounter. In fact, Micatrotto stated in her interview that "we didn't tell her anything, we just said, we are here to have lunch, and that was it."
The trial court subsequently instructed the jury as follows:
 As you know, we're into the presentation of testimony in this case and the events involved in this occurred in 1991. You must not give any consideration to or speculate in any way about why there has been a delay in this proceeding. I want to assure you there are about as many different reasons for delays in trials as the human mind can imagine. The fact that this case has been delayed in coming to trial is not a basis for any inference about the guilt or innocence of the defendant. Your decision on that matter must be based only upon the evidence that is being presented at this trial.
(Tr. at 1010-11)
This instruction adequately addressed the issue of speculation of the trial's delay on defendant's guilt or innocence. The instruction clearly expresses to the jury that it must not speculate in any way as to why there has been a delay in the proceedings. We are generally required to presume that jurors follow the instructions given to them by the trial judge. Statev. Loza (1994), 71 Ohio St.3d 61, 75; Pang v. Minch (1990),53 Ohio St.3d 186, 195. Accordingly, we must presume that the jury did not speculate that defendant was found guilty in a previous trial. We find no error in the trial court's ruling denying the motion for mistrial.
Assignment of Error I is overruled.
 II. BECAUSE THE JURY WAS NOT INSTRUCTED PROPERLY UNDER R.C. 2903.01(D) IN DETERMINING THE CULPABLE MENTAL STATE REQUIRED FOR AN AGGRAVATED MURDER CONVICTION UNDER R.C. 2903., 01(B), THE JURY'S GUILTY VERDICT WAS UNRELIABLE AND ANTHONY WALKER WAS DEPRIVED OF DUE PROCESS RIGHTS GUARANTEED UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
In his second assignment of error, defendant asserts that the trial court erroneously instructed the jury on R.C. 2903.01(D) when it failed to state to the jury that any inference of an intent to kill is non-conclusive as required by this section. Defendant asserts that this section requires the court to instruct the jury that such an inference is non-conclusive. We find no merit to this argument.
In the instant case, defendant was charged with aggravated murder in violation of R.C. 2903.01(3). This section defined felony murder as:
 R.C. 2903.01 Aggravated murder; specific intent to cause death
* * *
 (B) No person shall purposely cause the death of another immediately after committing or attempting to commit kidnapping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape.
Under subsection (D) of that statute, the State had to show that defendant specifically intended to cause the death of another. Moreover, the trial court had to give thorough guidance to the jury in making that finding as subsection (D) of R.C. 2903.01 provides:
 (D) No person shall be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another. In no case shall a jury in an aggravated murder case be instructed in such a manner that it may believe that a person who commits or attempts to commit any offense listed in division (B) of this section is to be conclusively inferred, because he engaged in a common design with others to commit the offense by force and violence or because the offense and the manner of its commission would be likely to produce death, to have intended to cause the death of any person who is killed during the commission of, attempt to commit, or flight from the commission or attempt to commit, the offense. If a jury in an aggravated murder case is instructed that a person who commits or attempts to commit any offense listed in division (B) of this section may be inferred, because he engaged in a common design with others to commit the offense by force or violence or because the offense and the manner of its commission would be likely to produce death of any person who is killed during the commission of, attempt to commit, or flight from the commission of or attempt to commit the offense, the jury shall also be instructed that the inference is non-conclusive, that the inference may be considered in determining intent, that it is to consider all evidence introduced by the prosecution to indicate the person's intent and by the person to indicate his lack of intent in determining whether the person specifically intended to cause the death of the person killed, and that the prosecution must prove the specific intent of the person to have caused the death by proof beyond a reasonable doubt.
On the element of specific intent, the court gave the following charge:
 As you know, Counts 6 and 7 charge the crimes of aggravated murder upon Derrick Harris, Count 6 on the theory that Mr. Walker, acting in complicity, purposely and with prior calculation and design, caused the death of Derrick Harris, and Count 7 on the theory that, acting in complicity, Mr. Walker purposely caused the death of Derrick Harris while committing or attempting to commit or while fleeing immediately after committing the crimes of aggravated burglary and/or aggravated robbery.
 With respect to each of those counts, It is necessary that if you find that Derrick Harris was a live human being at the time the act of killing began and that both Anthony. Walker and the person who performed the act causing the death of Derrick Harris specifically intended that Derrick Harris should die.
 One is not guilty of the crime of aggravated murder unless he intended to cause the death of someone. Purpose or intention to cause death may not be conclusively inferred from the fact that the defendant acted in complicity to commit a crime that carried the possibility of death. Although a death might result from another crime, a person acting in complicity cannot be found guilty of aggravated murder unless it is proved beyond a reasonable doubt that he specifically intended death to result from the other crime.
 If the state has not proved beyond a reasonable doubt that Anthony Walker intended that Derrick Harris should die, Mr. Walker would not be guilty of the crime of aggravated murder.
(Tr. at 1961-62)
During deliberations, the jury sent a written question to the court asking for clarification on the wording of this instruction. The jury thought that language was inconsistent with the language describing Count 7 on the verdict sheets. (Tr. at 2003-04). In response to this, the court gave a second instruction on aggravated murder at the request of defense counsel:
 The complete and total definition of aggravated murder in Count 7 is contained in the transcription and that is what you must follow, and that definition, which I'll read to you again, says: "You should find Anthony Walker guilty of aggravated murder under Count 7 if the State of Ohio has proved beyond a reasonable doubt that on or about. April 30, 1991, in Cuyahoga County, Derrick Harris was a living person, that someone purposely caused the death of Derrick Harris while committing, attempting to commit, or fleeing immediately after committing or attempting to commit aggravated burglary or aggravated robbery, or both, and that Anthony Walker, with a purpose that someone should die, acted in complicity to cause the death of Derrick Harris."
(Tr. at 2004)
The defendant contends that these instructions did not meet the required language of Subsection (D) respecting the non-conclusive effect of inferences of specific intent to purposely cause the death of Derrick Harris.
Initially, defendant concedes that defense counsel did not object to the jury instruction which he claims to be in error. The record clearly reflects that defense counsel expressed to the court that he had no objections to the jury instructions. (Tr. at 1998-1999). "Failure to object to a jury instruction constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise." State v. Underwood (1983), 3 Ohio St.3d 12, syllabus;State v. Long (1978). 53 Ohio St.2d 91. In State v. Williford
(1990), 49 Ohio St.3d 247, 251, the Supreme Court found that "[w] e have repeatedly held that a failure to object before the jury retires in accordance with the second paragraph of Crim.R. 30(A), absent plain error, constitutes a waiver." The second paragraph of Crim.R. 30(A) states in pertinent part:
 On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.
Even assuming arguendo that the defendant had preserved this issue for appeal, defendant's assertion that the trial court instructed the jury on R.C. 2903.01(B) without stating "the inference is non-conclusive" as required by R.C. 2903.01(D) is unsupported by the record. Defendant correctly asserts that R.C.2903.01(D) mandates that "if the jury is instructed that the requisite intent to cause death may be inferred from the fact that defendant engaged in a common design with others to commit the offense by force or violence, the jury also must be instructed that the inference is non-conclusive." State v.Coleman (1988), 37 Ohio St.3d 286, paragraph one of the syllabus. However, the record clearly reflects that the jury was never instructed to infer defendant's intent from his complicity.
Based on the instructions given to the jury, the trial court continuously and thoroughly instructed the jury that it must find that defendant intended to cause the death of the victim in order to find him guilty of felony murder under R.C. 2903.01(B). We find that the trial court did not instruct the jury that intent or purpose to cause death could be inferred from the fact that defendant engaged in a "common design with others to commit an offense." In fact, the trial court specifically instructed the jury to the contrary as follows:
 * * * Purpose or intention to cause death may not be conclusively inferred from the fact that the defendant acted in complicity to commit a crime that carried the possibility of death. Although a death might result from another crime, a person acting in complicity cannot be found guilty of aggravated murder unless it is proved beyond a reasonable doubt that he specifically intended death to result from the other crime.
(Tr. at 1962)
In examining the trial court's jury instructions, we do not review portions of those instructions in isolation, rather we review the court's charge as a whole in determining whether the jury was properly instructed. State v. Burchfield (1993), 66 Ohio St.3d 261,262.
We see no material differences between the omitted instruction proposed by defendant on appeal and the instruction given above. Therefore, because the trial court did not instruct the jury to infer intent, it was not required to instruct the jury that the inference of intent is not conclusive under R.C. 2903.01(D).
Assignment of Error II is overruled.
 III. COUNSEL'S FAILURE TO OBJECT TO AN INCOMPLETE JURY INSTRUCTION WHICH WENT TO THE HEART OF ANTHONY WALKER'S CONVICTION FOR AGGRAVATED MURDER DEPRIVED MR. WALKER OF EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.
In his third assignment of error, defendant essentially argues in the alternative to Assignment of Error II previously addressed. He claims ineffective assistance of counsel for failure to object to the instructions previously described.
This Court described the standard of review to make a showing of ineffective assistance of counsel in Lakewood v. Town (1995),106 Ohio App.3d 521, 525-26:
 The standard of review for ineffective assistance of counsel requires a two-part test and is set forth in Strickland v. Washington
(1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. See, also, State v. Bradley
(1989), 42 Ohio St.3d 136, 538 N.E.2d 373. "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland at 687-688, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. The defendant must also prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.
Furthermore, when determining whether counsel's performance was deficient "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Strickland v.Washington (1984), 466 U.S. 668, 689.
In response to defendant's Assignment of Error II, we found that the trial court correctly instructed the jury regarding specific intent and that it could not infer defendant's intent to kill from his complicity. Since we find no error in the jury instructions, any objection thereto would have been futile. Therefore, defense counsel's failure to object to these correct instructions did not fall below an objective standard of reasonableness to constitute ineffective assistance of counsel.
Assignment of Error III is overruled.
 IV. THE TRIAL COURT ABUSED ITS DISCRETION AND IMPAIRED APPELLANT'S RIGHT TO APPELLATE REVIEW BY FAILING TO JOURNALIZE APPELLANT'S CONVICTION FOR OVER TWO YEARS DURING WHICH TIME ESSENTIAL PARTS OF THE RECORD WERE LOST.
In his fourth assignment of error, defendant contends that he was prevented from exercising his right to appellate review for over two years because the appellate record does not contain either the signed verdict forms or the transcript of jury instructions which was sent to the jury room for use in deliberations and the trial court failed to journalize its sentencing order. We find no merit to these contentions.
First, the appellant has the burden to include all relevant evidence in the appellate record so that the claimed error can be demonstrated to the reviewing court. State v. Roberts (1991),66 Ohio App.3d 654, 657. In the absence of a complete record, we must presume regularity in the trial court's proceedings and accept the validity of its judgment. Id.; State v. Prince (1991),71 Ohio App.3d 694, 698.
When the record of the proceedings in the trial court, either by error or by accident, is incomplete or incorrect, App.R. 9(E) provides a remedy for an appellant to correct or modify the record by stipulation of the parties or by the trial court. App.R. 9(E) provides in pertinent part:
 * * * If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation, or the trial court, either before or after the record is transmitted to the court of appeals, or the court of appeals, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected, and if necessary that the supplemental record be certified and transmitted * * *.
However, defendant made no effort to correct the alleged omissions in the record per App.R. 9(E), by submitting to the trial court any changes he believed were necessary for the disposition of an appeal. Accordingly, we must conduct our appellate review in this case based on the record before us and must indulge the presumption of regularity of proceedings in the trial court.
Given defendant's failure to satisfy his burden to provide a complete record for appellate review, he cannot now assert on appeal that he was prejudiced by the incomplete record. "Under the invited error doctrine, a party will not be permitted to take advantage of an error which he himself, invited or induced the trial court to make." State v. Nievas (1997), 121 Ohio App.3d 451,456, quoting State ex rel. Bitter v. Missig (1996), 74 Ohio St.3d 249
[72 Ohio St.3d 249], 254; State v. Wilson (1996), 74 Ohio St.3d 381, 396;State v. Hayes (Sept. 5, 1996), Cuyahoga App. No. 70052, unreported.
In the instant case, defendant had the burden to provide this Court with a compete record of the proceedings below. Defendant also had the opportunity under App.R. 9(E) to correct the omissions in the record of the signed verdict forms and the transcript of jury instructions but failed to do so. Accordingly, he cannot now take advantage of these omissions on appeal. We must presume that the trial court's proceedings were correct.
Defendant also asserts that he was prevented from exercising his right to appeal from the trial court's delay in journalizing his sentence. This assertion is also unsupported by the record.
The transcript of defendant's sentencing hearing clearly establishes that defendant was fully informed by the court that by agreeing to this particular sentence, he was giving up his right to appeal the sentence. (Supp. Tr. at 16-17). Regardless of this waiver, defendant could have informed the trial court pursuant to App.R. 9(E) of the omitted sentencing journal entry. The record is devoid of any explanation why defendant failed to pursue an appeal of his sentence. The record is also devoid of any statement that defendant failed to timely appeal his sentence because he was waiting for the trial court's sentencing order. We must again presume regularity in the trial court's proceedings. Accordingly, any prejudice that defendant has suffered from the alleged omissions from the record also constitute invited errors resulting from his own failure to prosecute his appeal for over two years after his conviction and sentence were imposed.
Assignment of Error IV is without merit.
 V. BY ALLOWING ABUNDANT IRRELEVANT EVIDENCE AND CHARACTER EVIDENCE, THE TRIAL COURT VIOLATED EVIDENCE RULES 402, 403 AND 404(B), AND UNDERMINED THE RELIABILITY OF ANTHONY WALKER'S TRIAL IN VIOLATION OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
In his final assignment of error, defendant asserts that he was prejudiced by the trial court's admission of irrelevant character evidence. Defendant asserts that the Tec-9 weapons confiscated from Tracy Martin's car on May 10. 1991 were irrelevant under Evid.R. 402 as there was no evidence that these were the guns used on April 30, 1991. Defendant asserts that the three packages containing ammunition casings and a live round of ammunition were also irrelevant under Evid.R. 402. He asserts that the testimony of Ronetta Johnson constituted prejudicial character evidence based entirely on speculation and hearsay. He also asserts that the stolen property identified by Ms. Harris as the, property stolen from her home on April 30, 1991 was also irrelevant under Evid.R. 402.
First, considering Ms. Harris' stolen property, the record reflects that defense counsel failed to object to the admission of this evidence and therefore this issue is waived on appeal. Failure of trial counsel to object at trial to the admission of evidence waives any claim of error absent plain error. State v.Goff (1998). 82 Ohio St.3d 123. 134; State v. Williams (1977),51 Ohio St.2d 112. "An alleged error `does not constitute plain error * * * unless, but for the error, the outcome of the trial clearly would have been otherwise.'" Goff, supra, quoting Statev. Long (1978), 53 Ohio St.2d 91, paragraph two of the syllabus.
In the instant case, because defense counsel failed to timely object to the admission of this evidence, the issue is waived on appeal. Even if the admission of this evidence was error, it does not constitute plain error as we cannot say that "but for" this admission, the outcome of defendant's trial clearly would have been different.
Furthermore, the trial court did not abuse its discretion in admitting the Tec-9 weapons and the ammunition into evidence. Relevant evidence is subject to the balancing test of Evid.R. 403. This rule excludes evidence if its probative value is substantially outweighed by unfair prejudice, confusion or issues, or misleading the jury. The admission or exclusion of evidence is left to the discretion of the trial court and will not be reversed absent an abuse of discretion. State v. Combs
(1991), 62 Ohio St.3d 278, 284; State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus; State v. Smith (Aug. 21, 1997) Cuyahoga App. No. 70855, unreported. An abuse of discretion is more than an error of law or judgment, it implies that the trial court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219; State v. Adams (1980), 62 Ohio St.2d 151, 157-158.
In the instant case, the trial court's admission of the Tec-9 weapons and the ammunition was not unreasonable, arbitrary or unconscionable. We cannot conclude that the probative value of this relevant evidence was substantially outweighed by unfair prejudice.
Even if this Court were to conclude that this evidence and Ronetta Johnson's testimony was erroneously admitted, we find that any such error was harmless. In order to hold error harmless, the court must be able to declare a belief that the error was harmless beyond a reasonable doubt. Chapman v.California (1967), 386 U.S. 18; State v. Lytle (1976).48 Ohio St.2d 391. A reviewing court may overlook an error where the admissible evidence comprises "overwhelming" proof of defendant's guilt. State v. Williams (1983),6 Ohio St.3d 281, 190.
In this case, there was overwhelming and highly persuasive evidence to support defendant's conviction. The testimony of defendant's co-conspirators, Relana English and Marvin Burrage, established that: defendant was the leader of the group who planned the "lick" of the Harris house; that he provided and passed out the weapons to be used and distributed the stolen goods and money to the group after the group returned to defendant's house. In light of the substantial evidence of defendant's guilt presented at trial, defendant has not established that he was materially prejudiced by the admission of this evidence.
Defendant's Assignment of Error V is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
DIANE KARPINSKI, J., and JOHN T. PATTON, J., CONCUR.
 _________________________________ JAMES M. PORTER ADMINISTRATIVE JUDGE